*PRELIMINARY PRINT*

VOLUME 598 U. S. PART 2

PAGES 306–318

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

MAY 11, 2023

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published. Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D.C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

Syllabus

## CIMINELLI *v.* UNITED STATES ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 21–1170.   Argued November 28, 2022—Decided May 11, 2023

Petitioner Louis Ciminelli was convicted of federal wire fraud for his involvement in a scheme to rig the bid process for obtaining state-funded development projects associated with then-New York Governor Andrew Cuomo's Buffalo Billion initiative.  The Buffalo Billion initiative was administered by the nonprofit Fort Schuyler Management Corporation.  Investigations uncovered that Fort Schuyler board member Alain Kaloyeros paid lobbyist Todd Howe $25,000 in state funds each month to ensure that the Cuomo administration gave Kaloyeros a prominent role in administering projects for Buffalo Billion.  Ciminelli's construction company, LPCiminelli, paid Howe $100,000 to $180,000 each year to help it obtain state-funded jobs.  In 2013, Howe and Kaloyeros devised a scheme whereby Kaloyeros would tailor Fort Schuyler's bid process to smooth the way for LPCiminelli to receive major Buffalo Billion contracts by designating LPCiminelli as a "preferred developer" with priority status to negotiate for specific projects.  Kaloyeros, Howe, and Ciminelli jointly developed a set of requests for proposal that effectively guaranteed LPCiminelli's selection as a preferred developer by treating unique aspects of LPCiminelli as qualifications for preferred-developer status.  With that status in hand, LPCiminelli secured the marquee $750 million "Riverbend project" in Buffalo.  After the scheme was uncovered, Ciminelli, Kaloyeros, Howe, and others were indicted for, as relevant here, wire fraud in violation of 18 U. S. C. § 1343 and conspiracy to commit the same under § 1349.

    In the operative indictment and at trial, the Government relied solely on the Second Circuit's right-to-control theory of wire fraud, under which the Government can establish wire fraud by showing that the defendant schemed to deprive a victim of potentially valuable economic information necessary to make discretionary economic decisions.  Consistent with that theory, the District Court instructed the jury that the term "property" in § 1343 "includes intangible interests such as the right to control the use of one's assets," which could be harmed by depriving Fort Schuyler of "potentially valuable economic information."  The jury convicted Ciminelli of wire fraud and conspiracy to commit wire fraud.  On appeal, Ciminelli argued that the right to control one's assets is not "property" for purposes of § 1343.  The Second Circuit af-

firmed the convictions on the basis of its longstanding right-to-control precedents.

*Held*: Because the right to valuable economic information needed to make discretionary economic decisions is not a traditional property interest, the Second Circuit's right-to-control theory cannot form the basis for a conviction under the federal fraud statutes.   Pp. 312–317.

(a) The federal wire fraud statute criminalizes the use of interstate wires for "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."   18 U. S. C. § 1343.   When the federal wire fraud statute was enacted, the "common understanding" of the words "to defraud" referred "to wronging one in his property rights."   *Cleveland* v. *United States*, 531 U. S. 12, 19.   This Court has therefore consistently understood the statute's "money or property" requirement as limiting the "scheme or artifice to defraud" element.   *Ibid.*   Even so, lower federal courts for decades interpreted the mail and wire fraud statutes to protect intangible interests unconnected to traditional property rights. See *Skilling* v. *United States*, 561 U. S. 358, 400.   This Court halted that trend in *McNally* v. *United States*, 483 U. S. 350, which confined the statutes to the "protect[ion of] individual property rights."   *Id.*, at 359, n. 8.

The right-to-control theory cannot be squared with the text of the federal fraud statutes, which are "limited in scope to the protection of property rights."   *Id.*, at 360.   The so-called right to control is not an interest that had "long been recognized as property" when the wire fraud statute was enacted.   *Carpenter* v. *United States*, 484 U. S. 19, 26.   From the theory's inception, the Second Circuit has not grounded the right to control in traditional property notions.   The theory is also inconsistent with the structure and history of the federal fraud statutes. Congress responded to this Court's decision in *McNally* by enacting § 1346, which revived only the intangible right of honest services, one of many intangible rights protected by courts under the fraud statutes pre-*McNally*.   Congress' silence regarding other such intangible interests forecloses the judicial expansion of the wire fraud statute to cover the intangible right to control.   Finally, by treating mere information as the protected interest, the right-to-control theory vastly expands federal jurisdiction to an almost limitless variety of deceptive actions traditionally left to state law.   Pp. 312–316.

(b) Despite relying exclusively on the right-to-control theory before the grand jury, District Court, and Second Circuit, the Government now concedes that the theory as articulated below is erroneous.   Yet, the Government insists that the Court can affirm Ciminelli's convictions by

applying facts presented to the jury below to the elements of a different wire fraud theory. The Court declines the Government's request, which would require the Court to assume not only the function of a court of first view, but also of a jury. See *McCormick* v. *United States*, 500 U. S. 257, 270–271, n. 8. Pp. 316–317.

13 F. 4th 158, reversed and remanded.

THOMAS, J., delivered the opinion for a unanimous Court. ALITO, J., filed a concurring opinion, *post*, p. 317.

*Michael R. Dreeben* argued the cause for petitioner. With him on the briefs were *Jenya Godina, Jason Zarrow*, and *L. Nicole Allan*. Briefs in support of petitioner were filed for Alain Kaloyeros by *Michael C. Miller, Reid H. Weingarten, Michael G. Scavelli*, and *Bruce C. Bishop*, and for Steven Aiello et al. by *Alexandra A. E. Shapiro, Ted Sampsell-Jones*, and *Daniel J. O'Neill*, all respondents under this Court's Rule 12.6.

*Deputy Solicitor General Feigin* argued the cause for the United States. With him on the brief were *Solicitor General Prelogar, Assistant Attorney General Polite, Austin L. Raynor*, and *William A. Glaser.**

JUSTICE THOMAS delivered the opinion of the Court.

In this case, we must decide whether the Second Circuit's longstanding "right to control" theory of fraud describes a valid basis for liability under the federal wire fraud statute, which criminalizes the use of interstate wires for "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representa-

---

*Briefs of *amici curiae* urging reversal were filed for the Associated General Contractors of America, Inc., by *Adrian L. Bastianelli III, Thomas J. Curran, Robert H. Bell*, and *Doris D. Short*; for Law Professors by *Michael D. Lieberman*; for the National Association of Criminal Defense Lawyers by *Joshua L. Dratel* and *Steven F. Molo*; and for the New York Council of Defense Lawyers by *Harry Sandick*.

*Adam G. Unikowsky* filed a brief for the Chamber of Commerce of the United States of America as *amicus curiae*.

tions, or promises." 18 U. S. C. § 1343. Under the right-to-control theory, a defendant is guilty of wire fraud if he schemes to deprive the victim of "potentially valuable economic information" "necessary to make discretionary economic decisions." *United States* v. *Percoco*, 13 F. 4th 158, 170 (CA2 2021) (internal quotation marks omitted). Petitioner Louis Ciminelli was charged with, tried for, and convicted of wire fraud under this theory. And the Second Circuit affirmed his convictions on that same basis.

We have held, however, that the federal fraud statutes criminalize only schemes to deprive people of traditional property interests. *Cleveland* v. *United States*, 531 U. S. 12, 24 (2000). Because "potentially valuable economic information" "necessary to make discretionary economic decisions" is not a traditional property interest, we now hold that the right-to-control theory is not a valid basis for liability under § 1343. Accordingly, we reverse the Second Circuit's judgment.

I

This case begins with then-New York Governor Andrew Cuomo's "Buffalo Billion" initiative. On its face, the initiative was administered through Fort Schuyler Management Corporation, a nonprofit affiliated with the State University of New York (SUNY) and the SUNY Research Foundation. It aimed to invest $1 billion in development projects in upstate New York. Later investigations, however, uncovered a wide-ranging scheme that involved several of former Governor Cuomo's associates, most notably Alain Kaloyeros and Todd Howe. Kaloyeros was a member of Fort Schuyler's board of directors and was in charge of developing project proposals for Buffalo Billion; Howe was a lobbyist who had deep ties to the Cuomo administration. Each month, Kaloyeros paid Howe $25,000 in state funds to ensure that the Cuomo administration gave Kaloyeros a prominent position in Buffalo Billion.

Ciminelli had a similar arrangement. His construction company, LPCiminelli, paid Howe $100,000 to $180,000 each year to help it obtain state-funded jobs. In 2013, Howe and Kaloyeros devised a scheme whereby Kaloyeros would tailor Fort Schuyler's bid process to smooth the way for LPCiminelli to receive major Buffalo Billion contracts. First, on Kaloyeros' suggestion, Fort Schuyler established a process for selecting "preferred developers" that would be given the first opportunity to negotiate with Fort Schuyler for specific projects. Then, Kaloyeros, Howe, and Ciminelli jointly developed a set of requests for proposal (RFPs) that treated unique aspects of LPCiminelli as qualifications for preferred-developer status. Those RFPs effectively guaranteed that LPCiminelli would be (and was) selected as a preferred developer for the Buffalo projects. With that status in hand, LPCiminelli secured the marquee $750 million "Riverbend project" in Buffalo.

After an investigation revealed their scheme, Ciminelli, Howe, Kaloyeros, and several others were indicted by a federal grand jury on 18 counts including, as relevant here, wire fraud in violation of 18 U. S. C. § 1343 and conspiracy to commit wire fraud in violation of § 1349.

Throughout the grand jury proceedings, trial, and appeal, the Government relied on the Second Circuit's "right to control" theory, under which the Government can establish wire fraud by showing that the defendant schemed to deprive a victim of potentially valuable economic information necessary to make discretionary economic decisions. The Government's indictment and trial strategy rested solely on that theory.[1] And, it successfully defeated Ciminelli and his co-

---

[1] An earlier indictment alleged that the Buffalo Billion contracts were the property at issue. But, to defend against the defendants' motion to dismiss, the Government relied solely on the theory that the scheme "defraud[ed] Fort Schuyler of its right to control its assets." App. 31–32. The District Court then relied expressly on the right-to-control theory in

defendants' motion to dismiss by relying on that theory.   In addition, it successfully moved the District Court to exclude certain defense evidence as irrelevant to that theory.   The Government also relied on that theory in its summation to the jury.

Consistent with the right-to-control theory, the District Court instructed the jury that the term "property" in § 1343 "includes intangible interests such as the right to control the use of one's assets."   App. 41.   The jury could thus find that the defendants harmed Fort Schuyler's right to control its assets if Fort Schuyler was "deprived of potentially valuable economic information that it would consider valuable in deciding how to use its assets."   *Ibid.*   The District Court further defined "economically valuable information" as "information that affects the victim's assessment of the benefits or burdens of a transaction, or relates to the quality of goods or services received or the economic risks of the transaction."   *Ibid.*   The jury found Ciminelli guilty of wire fraud and conspiracy to commit wire fraud and the District Court sentenced him to 28 months' imprisonment followed by 2 years' supervised release.

On appeal, Ciminelli challenged the right-to-control theory, arguing that the right to control one's assets is not "property" for purposes of the wire fraud statute.   Defending the wire fraud convictions, the Government relied solely on the right-to-control theory.   The Second Circuit affirmed the convictions based on its longstanding right-to-control precedents, holding that, by "rigging the RFPs to favor their companies, defendants deprived Fort Schuyler of potentially valuable economic information."   13 F. 4th, at 171 (internal quotation marks omitted).

We granted certiorari to determine whether the Second Circuit's right-to-control theory of wire fraud is a valid basis

denying the motion to dismiss.   *United States* v. *Percoco*, 2017 WL 6314146, *8 (SDNY, Dec. 11, 2017).

for liability under 18 U. S. C. §1343.   597 U. S. —— (2022).
And, we now hold that it is not.

## II

### A

The wire fraud statute criminalizes "scheme[s] or artifice[s]
to defraud, or for obtaining money or property by means of
false or fraudulent pretenses, representations, or promises."
§1343.   Although the statute is phrased in the disjunctive,
we have consistently understood the "money or property"
requirement to limit the "scheme or artifice to defraud" ele-
ment because the "common understanding" of the words "to
defraud" when the statute was enacted referred "to wrong-
ing one in his property rights."   *Cleveland*, 531 U. S., at 19
(internal quotation marks omitted).[2]   This understanding
reflects not only the original meaning of the text, but also
that the fraud statutes do not vest a general power in "the
Federal Government . . . to enforce (its view of) integrity in
broad swaths of state and local policymaking."   *Kelly* v.
*United States*, 590 U. S. ——, —— (2020).   Instead, these stat-
utes "protec[t] property rights only."   *Cleveland*, 531 U. S.,
at 19.   Accordingly, the Government must prove not only
that wire fraud defendants "engaged in deception," but also
that money or property was "an object of their fraud."
*Kelly*, 590 U. S., at —— (alterations omitted).

Despite these limitations, lower federal courts for decades
interpreted the mail and wire fraud statutes to protect intan-
gible interests unconnected to traditional property rights.
See *Skilling* v. *United States*, 561 U. S. 358, 400 (2010) (re-
counting how "the Courts of Appeals, one after the other,

_____

[2] Although *Cleveland* involved the mail fraud statute, 18 U. S. C. §1341,
"we have construed identical language in the wire and mail fraud statutes
*in pari materia.*"   *Pasquantino* v. *United States*, 544 U. S. 349, 355, n. 2
(2005).

interpreted the term 'scheme or artifice to defraud' to include deprivations not only of money or property, but also of intangible rights"). For example, federal courts held the fraud statutes reached such intangible interests as the right to "honest services," *ibid.* (internal quotation marks omitted); the right of the citizenry to an honest election, see *United States* v. *Girdner*, 754 F. 2d 877, 880 (CA10 1985); and the right to privacy, *United States* v. *Louderman*, 576 F. 2d 1383, 1387 (CA9 1978). In *McNally* v. *United States*, 483 U. S. 350 (1987), this Court halted that trend by confining the federal fraud statutes to their original station, the "protect[ion of] individual property rights." *Id.*, at 359, n. 8. Congress then amended the fraud statutes "specifically to cover one of the 'intangible rights' that lower courts had protected under [the statutes] prior to *McNally*: 'the intangible right of honest services.'" *Cleveland*, 531 U. S., at 19–20 (quoting 18 U. S. C. § 1346).

The right-to-control theory applied below first arose after *McNally* prevented the Government from basing federal fraud convictions on harms to intangible interests unconnected to property. See *United States* v. *Wallach*, 935 F. 2d 445, 461–464 (CA2 1991). As developed by the Second Circuit, the theory holds that, "[s]ince a defining feature of most property is the right to control the asset in question," "the property interests protected by the wire fraud statute include the interest of a victim in controlling his or her own assets." *United States* v. *Lebedev*, 932 F. 3d 40, 48 (2019) (alterations omitted). Thus, a "cognizable harm occurs where the defendant's scheme denies the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions." *United States* v. *Binday*, 804 F. 3d 558, 570 (CA2 2015) (alterations omitted).[3]

---

[3] At least two Circuits have expressly repudiated the right-to-control theory of wire fraud. *United States* v. *Sadler*, 750 F. 3d 585, 590–592 (CA6 2014); *United States* v. *Bruchhausen*, 977 F. 2d 464, 467–469 (CA9

The right-to-control theory cannot be squared with the text of the federal fraud statutes, which are "limited in scope to the protection of property rights." *McNally,* 483 U. S., at 360. The so-called "right to control" is not an interest that had "long been recognized as property" when the wire fraud statute was enacted. *Carpenter* v. *United States*, 484 U. S. 19, 26 (1987). Significantly, when the Second Circuit first recognized the right-to-control theory in 1991—decades after the wire fraud statute was enacted and over a century after the mail fraud statute was enacted—it could cite no authority that established "potentially valuable economic information" as a traditionally recognized property interest. See *Wallach*, 935 F. 2d, at 462–463.[4] And, the Second Circuit has not since attempted to ground the right-to-control theory in traditional property notions. We have consist-

---

1992). Several other Circuits have embraced the theory to varying degrees. See, *e. g., United States* v. *Gray*, 405 F. 3d 227, 234 (CA4 2005) (collecting cases).

[4] The only judicial authority the Second Circuit cited for this key proposition was a 1989 Fifth Circuit opinion that conclusorily asserted that "[t]he economic value of . . . knowledge" was "sufficient 'property' to implicate" the mail fraud statute, and that appears to have misunderstood 18 U. S. C. § 1346 as "eliminating the requirement of property loss" in all cases. *United States* v. *Little*, 889 F. 2d 1367, 1368–1369. The Second Circuit then proceeded to rely on the "bundle of sticks" metaphor of property rights. See *United States* v. *Wallach*, 935 F. 2d 445, 463 (1991) ("[G]iven the important role that information plays in the valuation of a corporation, the right to complete and accurate information is one of the most essential sticks in the bundle of rights that comprise a stockholder's property interest"). But that metaphor—whatever its merits in other contexts—cannot compensate for the absence of an interest that itself "has long been recognized as property," *Carpenter* v. *United States*, 484 U. S. 19, 26 (1987), particularly in light of our rejection of attempts to construe the federal fraud statutes "in a manner that leaves [their] outer boundaries ambiguous." *McNally* v. *United States*, 483 U. S. 350, 360 (1987). As noted above, the right to information necessary to make informed economic decisions, while perhaps useful for protecting and making use of one's property, has not itself traditionally been recognized as a property interest.

ently rejected such federal fraud theories that "stray from traditional concepts of property." *Cleveland*, 531 U. S., at 24. For its part, the Government—despite relying upon the right-to-control theory for decades, including in this very case—now concedes that if "the right to make informed decisions about the disposition of one's assets, without more, were treated as the sort of 'property' giving rise to wire fraud, it would risk expanding the federal fraud statutes beyond property fraud as defined at common law and as Congress would have understood it." Brief for United States 25–26. Thus, even the Government now agrees that the Second Circuit's right-to-control theory is unmoored from the federal fraud statutes' text.

The right-to-control theory is also inconsistent with the structure and history of the federal fraud statutes. As recounted above, after *McNally* put an end to federal courts' use of mail and wire fraud to protect an ever-growing swath of intangible interests unconnected to property, Congress responded by enacting § 1346, which—despite the wide array of intangible rights courts protected under the fraud statutes pre-*McNally*—revived "*only* the intangible right of honest services." *Cleveland*, 531 U. S., at 19–20 (emphasis added). "Congress' reverberating silence about other [such] intangible interests" forecloses the expansion of the wire fraud statute to cover the intangible right to control. *United States* v. *Sadler*, 750 F. 3d 585, 591 (CA6 2014).

Finally, the right-to-control theory vastly expands federal jurisdiction without statutory authorization. Because the theory treats mere information as the protected interest, almost any deceptive act could be criminal. See, *e. g.*, *United States* v. *Viloski*, 557 Fed. Appx. 28 (CA2 2014) (affirming right-to-control conviction based on an employee's undisclosed conflict of interest). The theory thus makes a federal crime of an almost limitless variety of deceptive actions traditionally left to state contract and tort law—in flat contradiction with our caution that, "[a]bsent [a] clear statement by

Congress," courts should "not read the mail [and wire] fraud statute[s] to place under federal superintendence a vast array of conduct traditionally policed by the States." *Cleveland*, 531 U. S., at 27. And, as it did below, the Second Circuit has employed the theory to affirm federal convictions regulating the ethics (or lack thereof) of state employees and contractors—despite our admonition that "[f]ederal prosecutors may not use property fraud statutes to set standards of disclosure and good government for local and state officials." *Kelly*, 590 U. S., at —— (alterations omitted). The right-to-control theory thus criminalizes traditionally civil matters and federalizes traditionally state matters.

In sum, the wire fraud statute reaches only traditional property interests. The right to valuable economic information needed to make discretionary economic decisions is not a traditional property interest. Accordingly, the right-to-control theory cannot form the basis for a conviction under the federal fraud statutes.

B

Despite indicting, obtaining convictions, and prevailing on appeal based solely on the right-to-control theory, the Government now concedes that the theory as articulated below is erroneous. Brief for United States 24–26. The Government frankly admits that, "to the extent that language in the [Second Circuit's] opinions might suggest that depriving a victim of economically valuable information, without more, necessarily qualifies as 'obtaining money or property' within the meaning of the fraud statutes, that is incorrect." *Id.*, at 24. That should be the end of the case.

Yet, the Government insists that its concession does not require reversal because we can affirm Ciminelli's convictions on the alternative ground that the evidence was sufficient to establish wire fraud under a traditional property-fraud theory. *Id.*, at 31–32. With profuse citations to the records below, the Government asks us to cherry-pick facts presented to a jury charged on the right-to-control theory

and apply them to the elements of a *different* wire fraud theory in the first instance.  In other words, the Government asks us to assume not only the function of a court of first view, but also of a jury.  That is not our role.  See, *e. g.*, *McCormick* v. *United States*, 500 U. S. 257, 270–271, n. 8 (1991) ("Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury"); *Chiarella* v. *United States*, 445 U. S. 222, 236 (1980).  Accordingly, we decline the Government's request to affirm Ciminelli's convictions on alternative grounds.

### III

The right-to-control theory is invalid under the federal fraud statutes.  We, therefore, reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE ALITO, concurring.

The opinion of the Court correctly answers the sole question posed to us: whether the right-to-control theory supports liability under the federal wire fraud statute.  The jury instructions embody that theory, and therefore this error, unless harmless, requires the reversal of the judgment below.  I do not understand the Court's opinion to address fact-specific issues on remedy outside the question presented, including: (1) petitioner's ability to challenge the indictment at this stage of proceedings, see Fed. Rule Crim. Proc. 12(b)(3)(B); (2) the indictment's sufficiency, see *United States* v. *Miller*, 471 U. S. 130, 134–135 (1985) (variance from indictment did not make indictment insufficient); (3) the applicability of harmless error to particular invocations of the right-to-control theory during trial, see *Neder* v. *United States*, 527 U. S. 1, 15 (1999) (omission of element in jury instructions subject to harmless error); and (4) the Govern-

ment's ability to retry petitioner on the theory that he conspired to obtain, and did in fact obtain, by fraud, a traditional form of property, viz., valuable contracts. On this understanding, I join the Court's opinion.

Page Proof Pending Publication

REPORTER'S NOTE

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

p. 306, line 16, "(RFPs)" is deleted
p. 312, last line, "another" is changed to "the other"
p. 316, line 9, "state and local officials" is changed to "local and state officials"